UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN  DIVISION

SCOTT GORDON PAYNE,

                    Petitioner,                    Case No. 1:11-cv-325

v.                                                 Honorable Paul L. Maloney

HEIDI WASHINGTON,

                    Respondent.

_____/

## OPINION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was charged in the Kent County Circuit Court in five separate cases alleging criminal sexual conduct involving different victims. The cases were consolidated for trial in 2007.  After a jury trial, Petitioner was convicted of various counts of criminal sexual conduct in Case No. 06-011875-FC (victim Bryant), Case No. 06-012819-FH (victim Carter), Case No. 06-011607-FC (victim Kolk), and Case No. 06-011944-FC (victim Fettig).  Petitioner was acquitted in the fifth case.  As set forth below, the Michigan Court of Appeals reversed Petitioner's convictions in the Kolk and Fettig cases on Confrontation Clause grounds.

In the Bryant case, Petitioner was convicted of two counts of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b(1)(e) (Count 1) and MICH. COMP. LAWS § 750.520b(1)(f) (Count 2), for which the trial court sentenced him as a third-offense habitual offender, MICH. COMP. LAWS § 769.11, to life imprisonment for Count 1 and 40 to 60 years in prison for Count

2. In the Carter case, Petitioner was convicted of third-degree criminal sexual conduct (CSC III), MICH. COMP. LAWS § 750.520d(1)(b), for which the trial court sentenced him as a fourth-offense habitual offender, MICH. COMP. LAWS § 769.12, to 20 to 40 years in prison.

Petitioner raised two grounds for relief in his original petition (ECF No. 1) and was subsequently granted leave to amend to raise a third claim (6/10/13 Mem. Op. and Ord., ECF Nos. 55-56), as follows:

I.     Petitioner's right to the presumption of innocence and a fair trial were violated when, during the first two days of trial, Petitioner faced the jury with a long, wild beard, wearing leg irons and surrounded by armed deputies.

II.    Petitioner's Sixth Amendment right to the effective assistance of counsel was violated when trial counsel: (1) refused to meet with Petitioner before trial; (2) failed to secure Petitioner's presence at a single pre-trial hearing; (3) failed to obtain independent testing of the available DNA evidence; (4) failed to prevent Petitioner from appearing before the jury with a long, wild beard and leg irons; (5) failed to make an opening statement; and (6) elicited improper testimony on cross-examination of two prosecutorial witnesses.

III.   The introduction of DNA evidence in violation of the Confrontation Clause in two consolidated cases requires reversal of the judgment in the other two cases.

Respondent filed an answer (ECF No. 19) to the original petition and a supplemental answer to Petitioner's third ground for relief (ECF No. 57). Petitioner filed a reply (ECF No. 44) and a supplemental reply (ECF No. 62), respectively. Upon review and applying the AEDPA standards, the Court finds that the petition should be denied for failure to raise a meritorious federal claim.

### Factual Allegations & Procedural History

I.      **Trial Court Proceedings**

Petitioner was tried before a jury beginning on May 21, 2007 and ending on June 1, 2007.[1]

The following evidence was presented to the jury:

A.      Kolk Case

Cynthia (Eerdmans) Kolk, testified that she lived in the City of Wyoming on June 20, 1989. (Trial Tr. III(A), 92-93.) Around 11:30 p.m. that evening, Kolk walked from her home to the grocery store. (*Id.* at 95-96.) When she left, Kolk noticed a man walking on the sidewalk in front of her house. (*Id.* at 96.) As she returned from the store by the same route, the same man she had seen earlier on the sidewalk grabbed her, dragged her under the bushes, forced her on her stomach, and sexually assaulted her. (*Id.* at 96-97.) The man was holding something to her back that felt like a knife and threatened to kill her. (*Id.* at 96-97, 99-100.) The man attempted to penetrate her with his penis, although she was not certain if he had a full erection. (*Id.* at 97-98.) He also penetrated her with his fingers. (*Id.*) When the man was finished, he told Kolk to stay down for a few minutes or he would kill her. (*Id.* at 99.) He went through her purse and took some cash before leaving. (*Id.*) Kolk called the police and was transported

---

[1] The trial transcripts will be referenced as follows:

| | | |
|---|---|---|
| May 21, 2007 | Trial Transcript Vol. I | (Trial Tr. I, ECF No. 28) |
| May 22, 2007 | Trial Transcript Vol. II | (Trial Tr. II, ECF No. 29) |
| May 23, 2007 | Trial Transcript Vol. III(A) | (Trial Tr. III(A), ECF No. 30) |
| May 23, 2007 | Trial Transcript Vol. III (B) | (Trial Tr. III(B), ECF No. 31) |
| May 24, 2007 | Trial Transcript Vol. IV | (Trial Tr. IV, ECF No. 32) |
| May 25, 2007 | Trial Transcript Vol. V | (Trial Tr. V, ECF No. 33) |
| May 29, 2007 | Trial Transcript Vol. VI | (Trial Tr. VI, ECF No. 34) |
| May 30, 2007 | Trial Transcript Vol. VII | (Trial Tr. VII, ECF No. 35) |
| June 1, 2007 | Trial Transcript Vol. VIII` | (Trial Tr. VIII, ECF No. 36) |
| June 1, 2007 | Trial Transcript Vol. VIII(B) | (Trial Tr. VIII(B), ECF No. 37) |

to the hospital for a rape exam. (*Id*. at 100.) Kolk was unable to provide information for a composite drawing of her attacker because she did not get a close enough look at him. (*Id.* at 101.)

Sergeant Daniel Bursma of the Wyoming Police Department testified that he was dispatched at about 1:00 a.m. on June 20, 1989, to investigate the sexual assault reported by Cindy (Eardmans) Kolk. (Trial Tr. IV, 52.) Kolk showed Bursma the location where the assault occurred, which was in a landscaped area near a parking lot across the street from her home. (*Id*. at 53-55.) Bursma took Kolk to Butterworth Hospital for a rape examination. He collected the clothing she was wearing and the rape kit. (*Id*. at 57.) Kolk's glasses were knocked off and she was face-down during the assault so she was unable to provide a description of the assailant for purposes of preparing a composite sketch. (*Id*. at 59-60.)

### B.    Fettig Case

Dorris Inman testified that her daughter, Robin (Thompson) Fettig, was unable to testify at trial because she lived in Arizona, where her husband was stationed in the army. (Trial Tr. III(A), 100-102.) Because of his job, Fettig's husband could not care for their children in her absence. (*Id*.) Inman testified that Fettig attended Jackson Middle School on May 25, 1989. (*Id*. at 103.) Fettig was late coming home from school that day. Inman eventually received a phone call from Fettig, who was at a friend's house, asking Inman to pick her up. (*Id*. at 104.) When Inman picked her up, she could tell something was wrong. Fettig was dirty and had grass and twigs in her hair. (*Id.*) Fettig initially gave Inman an explanation for her condition that Inman did not believe. (*Id*. at 105.) After they got home, Inman continued to ask Fettig what had happened. Fettig, who was in the bathtub, broke down crying. (*Id*. at 106-07.) Based upon what her daughter told her, Inman called the police and they took her to the hospital

where she received a rape exam. (*Id*. at 144.) The police retained the clothing that she was wearing at the time of the attack. (*Id*. at 145.) Fettig provided information to the police for a composite drawing. (*Id*.)

Paula Wiersma testified that she was fourteen-years-old in 1989. (Trial Tr. IV, 13.) Robin (Thompson) Fettig was her friend and classmate at that time. Wiersma and Fettig often walked home from school together through Jackson Park. (*Id*. at 13.) On May 25, 1989, the girls did not walk home together. Wiersma was in a party store across the street from her house when Fettig came in. Fettig was crying, her hair and clothing were disheveled and dirty, and she was not wearing shoes. (*Id*. at 14-15.) Wiersma took Fettig back to Wiersma's house and helped Fettig clean up a bit before she went home. (*Id*. at 15-16.)

Kurt Robinson testified that he was employed as a Police Officer for the City of Wyoming in 1989. (Trial Tr. VI, 14.) On May 25, 1989, Robinson was dispatched to Robin (Thompson) Fettig's residence concerning a reported sexual assault. (*Id*. at 17-18.) Based upon his interview, Robinson identified a crime scene that extended from the Jackson Park Recreational Field to a church parking lot. (*Id*. at 18.) Robinson collected the clothing the victim was wearing at the time of the assault as evidence. (*Id*. at 20.) He also collected the victim's bra from Paula Wiersma's residence. (*Id*. at 21.) Robinson accompanied Fettig to the hospital for a rape examination and collected the rape kit as evidence. (*Id*. at 21-22.) Fettig worked with Officer George Davis to make a composite sketch of the assailant. (*Id.* at 23.) All of the evidence held by the Wyoming Police Department in the case had been returned or was destroyed in 1993, except for the DNA extract, which was destroyed in 2005. (*Id*. at 25-29.)

C.      Bryant Case

Judith Bryant testified that she was forty-four-years-old in 1989. On August 6, 1989, she went to visit her stepfather in Wyoming, Michigan. (Trial Tr. IV, 17-19.) Bryant left to walk home at about 11:30 p.m. (*Id*. at 20.) As Bryant was crossing a baseball field next to her stepfather's house, a man asked her for a light. (*Id*. at 20-22.) Bryant initially declined, but after he asked again, she turned around to light his cigarette. As she approached him, the man grabbed her. (*Id*. at 22.) When Bryant started fighting, the man punched her in the face with his fists, shook her head and choked her. He covered her face with his hand so that she had trouble breathing and kept telling her that she was going to die. (*Id*.) The man pulled her pants down to her ankles, pushed up her shirt and bra and vaginally penetrated her twice. He continued to tell her that she was going to die. (*Id*. at 24.) He used Bryant's shoe laces to tie up her hands and feet, held a knife to her throat and forced her to perform oral sex on him. (*Id*. at 25-26.) When he was finished, the man shoved a cigarette in her mouth and walked away. (*Id*. at 27.) Bryant freed herself from the shoelaces and ran back to her stepfather's house for help. (*Id*. at 28.) From there, she went to Butterworth Hospital and underwent a rape examination. (*Id*. at 29-30.) Bryant was uncertain what clothing she wore to the hospital, but any semen found on the panties she was wearing at the hospital was from her attacker. (*Id*. at 29-36.) Bryant did not see her attacker again until the preliminary examination in 2006. (*Id*. at 30.) She was asked to draw a composite of the assailant after the incident, but was not completely satisfied with how it turned out. (*Id*. at 30-31.) Bryant identified Petitioner at trial as the man who attacked her. (*Id*. at 33-34.) She disputed telling defense counsel at the preliminary examination that she was unable to identify Petitioner due to the passage of time. (*Id*. at 33-35.)

Doctor Steven Holt and Nurse Ann Dolphin testified that they performed the rape examination of Judith Bryant at Butterworth hospital. (Trial Tr. IV, 37-38, 42.) They collected evidence

from the victim, including vaginal swabs. (*Id.*) They also collected the clothing the victim was wearing and the shoe laces that had been used to tie her hands and wrists. (*Id.*) The items were sealed in an evidence kit until they were picked up by a police officer. (*Id.* at 39, 42.) Officer Douglas Weggener of the Kentwood Police Department testified that he picked up the rape kit and secured it at the Kentwood Police Department. (Trial Tr. IV, 6-8.)

John Johnson testified that he lived with Judith Bryant's stepfather on August 6, 1989. (Trial Tr. IV, 47-48.) Johnson testified that Bryant walked over for a visit around 9:00 or 9:30 p.m. that evening and left around 11:30 p.m. to walk home. (*Id.* at 48.) About forty-five minutes later, Johnson heard banging on the door. It was Bryant, who had been badly beaten and said that someone was after her. (*Id.* at 49.) Johnson could not recall exactly what Bryant was wearing after the attack, but he had to give her some clothing to wear before he took her to Butterworth Hospital. (*Id.* at 49-50.)

Detective Larry Kerstetter testified that he was a detective for the Kentwood Police Department in 1989. (Trial Tr. III(B), 5.) Kerstetter was called to the hospital during the early morning hours of August 6, 1989, to meet with an assault victim, Judith Bryant. (*Id.* at 6.) Bryant told Kerstetter that she was walking through a park, when she was physically and sexually assaulted. Kerstetter could observe numerous cuts and bruises, as well and swelling on Bryant's face. (*Id.* at 6-9.) Bryant also had abrasions on her wrists where they had been tied with shoelaces, and still had a shoelace on one of her wrists when Kerstetter arrived. (*Id.* at 8-9.) Based upon the information provided by Bryant, Kerstetter located the crime scene in Kentwood Veteran's Park. Kerstetter collected several items off the ground, including a pack of cigarettes and Bryant's shoes. (*Id.* at 13-16.) Kerstetter was never able to locate a suspect in the case. (*Id.* at 16.) Kerstetter was not certain what testing, if any, was conducted with regard to the evidence that was collected in the case. (*Id.* at 17-22.)

-7-

Willard Obenchain testified that he had been an evidence technician for the Kentwood Police Department for 25 years. (Trial Tr. III(B), 27.) On August 7, 1989, Obenchain took all of the evidence collected by Detective Kerstetter to the State Police forensic laboratory in Grand Rapids. (*Id*. at 28; Trial Tr. VI, 7-8.) Obenchain identified the items contained in the bag of evidence, which included a knife. (Tr. VI, 8-11.) Obenchain also worked with Bryant to create a composite sketch of the person who assaulted her. (Trial Tr. III(B), 29-31.)

James Pierson, the laboratory director of the Michigan State Police crime lab in Grand Rapids, testified as an expert in the field of fingerprint analysis. (Trial Tr. III(B), 38.) In 2005, Pierson was asked to make some comparisons on some latent fingerprints that had been received in Bryant's case in 1989. (*Id*. at 40.) The examiner who first received the prints in 1989 had since retired. (*Id*.) That examiner was able to obtain identifiable fingerprints from two fingers on the cellophane of an open pack of cigarettes that was among the items submitted for testing. (*Id*. at 42.) Those prints were kept on file for future use by other examiners. (*Id*.) Pierson compared the fingerprints taken from the cigarette pack to known fingerprints taken from Petitioner and concluded that the fingerprints were not Petitioner's. (*Id*. at 47.) Another examiner, Shawn Baker, compared the prints from the cigarette pack to fingerprints taken from the victim and determined that the fingerprints found on the cigarette pack were not Bryant's. (*Id*. at 48; 62-65.)

Kevin Street of the Michigan State Police crime lab in Grand Rapids testified as an expert in the field of serology. (Tr. V, 62-63.) In 1989, Street tested vaginal swabs and smears related to the Judith Bryant case. Those tests indicated the presence of semen. (*Id*. at 64.) Street also found seminal stains on the victim's jeans and panties. (*Id*. at 65.) Street also conducted serological testing on vaginal

swabs and smears in the Cindy (Eardmans) Kolk case, which also revealed the presence of sperm cells. (*Id*. at 65-66.) He also found sperm cells on the victim's jeans. (*Id*. at 66.) The laboratory was not conducting DNA analysis that time. (*Id*.)

D.   Carter Case

Shakira Carter's preliminary examination testimony from December 21, 2006, was played for the jury. Carter testified that on May 15, 2004, she was working as a prostitute in the City of Grand Rapids. (Trial Tr. III(B), 53.) A man Carter identified as Petitioner, picked her up at the corner of Wealthy and Division. (*Id*.) He was driving an older model dark blue Blazer. (*Id*. at 59, 62.) Carter told Petitioner that her fee was "$40 and up," and he responded by telling her that he had the money and to hurry up and get in the car. (*Id*. at 54.) Petitioner drove her to a location under a bridge on Stevens Street. After he turned off the car, he began choking her and ordered her to empty her pockets. (*Id*.) Petitioner then ordered her to pull down her pants and penetrated her vagina with his penis. (*Id*. at 54-56.) After that, Petitioner attempted to put his penis in her mouth, but only touched her lips. (*Id*. at 56, 58.) Petitioner pushed Carter out of the vehicle and sped away. (*Id*. at 59, 68.) Carter climbed some fences and eventually was able to get help from an ambulance. (*Id*. at 59.) She was very afraid when the incident occurred and reported the sexual assault to police the same night. (*Id*. at 56-58.) Carter went to the YWCA for a rape examination, which included a vaginal swab. (*Id*. at 65.) Carter identified Petitioner as the man who assaulted her. (*Id*. at 60-61.)         Nurse Margaret Dayton testified as an expert in the field of evidence collection and as a nurse examiner in the field of sexual assault. (Trial Tr. IV, 70.) Dayton met Carter on May 15, 2004, after she reported being sexually assaulted. (*Id*.) Cater told Dayton that she got into a vehicle with a man who choked her and forced her to engage in sexual acts with

him, which included oral and vaginal penetration. (*Id.* at 71-72.) Dayton performed a rape examination and collected evidence, including vaginal swabs. (*Id.* at 74.) Dayton also collected the clothing that Carter was wearing at the time of the assault. (*Id.* at 75.) The rape kit and clothing was collected by Officer Wortz from the Grand Rapids Police Department. (*Id.* at 74-75.)

Officer Jeremy Wortz of the Grand Rapids Police Department testified that he was dispatched to meet an ambulance containing a rape victim on May 15, 2004. (Tr. V, 75-76.) The victim, Shakira Carter, told Wortz that she was working as a prostitute. (*Id.* at 76.) Wortz transported Carter to the YWCA for a forensic examination. Wortz collected the rape kit and clothing collected from the victim and secured the evidence at the police station. (*Id.* at 76-77.)

E.    Melissa Smith and the investigation leading to Petitioner's identification

Melissa Smith testified that she was working as a prostitute on Division Street in Grand Rapids on the night of May 26, 2004. (Tr. V, 79.) A man picked her up in a red minivan and drove her to a location off Stevens Street, near the expressway and Hall Street. (*Id.* at 79, 83.) When they stopped, Smith asked the man for payment. (*Id.* at 80.) At that point, the man took off his glasses and jumped on top of her. (*Id.*) The man told her that "[she] can make this the easy way or the hard way, that he would break [her] wrists to get into [her] pants." (*Id.* at 81.) Smith was afraid that no one would hear her if she screamed, so she bit the man as hard as she could on his thigh and laid her foot on the horn. (*Id.* at 81-82, 85-86.) Smith testified that this was the first time in two-and-half years of prostituting that she had bit someone in self-defense. (*Id.* at 93.) The man got off of her and she jumped out of the van. (*Id.* at 82.) The man told her that he was sorry and offered to drive her back, but she declined. (*Id.*) Smith did not immediately report the incident to the police. (*Id.* at 82-83.) The following night, the same man driving the

-10-

same van drove past Smith while she was walking on Division. Smith got his license plate number and called the police. (*Id*. at 83-84.) Smith identified Petitioner as the man who was driving the red van. (*Id*. at 85.) Smith saw Petitioner again a few months later driving a silver mini van. (*Id.* at 94-95.) He rolled down his window and said, "You're Melissa, ain't you." She did not report that incident to police because she was on drugs. (*Id*. at 94-95.)

Officer Jonathan Peters of the Grand Rapids Police Department testified that on May 27, 2004, he met with Melissa Smith, who had called to report a sexual assault. (Tr. V, 72-73.) Smith informed Peters that she was working as a prostitute and provided Peters with the assailant's license plate number. (*Id*. at 73.) Peters provided the license plate number to the detective assigned to investigate the case. (*Id*. at 74.)

Officer Robert Cervantes of the Grand Rapids Police Department testified that on May 28, 2004, he and Officer Tim Simons investigated a license plate related to the cases involving Shakira Carter and Melissa Smith. (Trial Tr. IV, 78-79.) They went to an address in Grand Rapids that was associated with the license plate, where they found a Blazer and a red van parked in the driveway. (*Id*. at 79-82.) The officers also found Petitioner at the address. Petitioner indicated that he was the primary driver of the vehicles parked in the driveway. (*Id*. at 83.) During the officers' conversation with Petitioner, he denied picking up prostitutes. (*Id.* at 84.) One of the victims reported biting her attacker on the leg, so Detective Simon asked Petitioner to raise his shorts so they could see his legs. When Petitioner raised his shorts, the officers observed a mark that appeared to be a bite. (*Id*.) Cervantes called a crime scene technician collect evidence at the scene. (*Id*.)

Dean Garrison, a crime scene technician with the Grand Rapids Police Department, testified that he collected evidence from Petitioner's residence on May 28, 2004. (Trial Tr. IV, 86-87.) Garrison lifted latent finger prints from the passenger sides of the Oldsmobile van and Chevy blazer. He also photographed the vehicles and the injury to Petitioner's right thigh. (*Id*. at 88-90.)

Grand Rapids Police Detective Matthew Kubiac testified that he took over the investigation of the Smith and Carter cases from Detective Simon in 2005. (Trial Tr. IV, 92-93.) Kubiac explained that they had difficultly locating Carter, so she was arrested on a material witness warrant to ensure her presence at the preliminary examination. (*Id*. at 95-96.) Carter was unable to appear for trial because she was deceased. (*Id*.) Kubiac believed that Carter was the victim of a homicide, but did not believe that Petitioner was a suspect in the homicide case. (*Id*. at 96, 107.) Cater identified a photograph of the Chevy Blazer at the preliminary examination. (*Id*. at 96-97.) After Kubiac received the Michigan State Police lab report in early February, 2005, he and detectives from Wyoming and Kentwood obtained a warrant to obtain a buccal swab for DNA from Petitioner, who was lodged at the Clinton County Jail. (*Id*. at 104.)

Jolinda Hall, Petitioner's sister, identified People's Exhibit No. 26 as a photograph of Petitioner. (Tr. V, 100.) Hall testified that Petitioner moved back to Michigan in 2004, after living out-of-state for several years. (*Id*. at 102-03.) He lived in Newago for about a month and then moved in with her in April 2004. (*Id*. at 102.) Deputy Kathleen Butts of the Kent County Sheriff's Department authenticated People's Exhibit No. 26 as a photograph of Petitioner taken on February 18, 1990. (*Id*. at 105.) On recall, Judith Bryant positively identified the man pictured in People's Exhibit No. 26 as the man who attacked her. (*Id*. at 125.)

-12-

F.      DNA Testing

Ann Hunt, a forensic scientist at the Michigan State Police crime lab in Grand Rapids, testified as an expert in DNA analysis. (Trial Tr. V, 25.) Hunt testified that in 1989, she received samples for testing related to the Robin (Thompson) Fettig case. (*Id.* at 29.) The items included a sexual assault evidence kit and a brown bag containing 18 separate items. (*Id.* at 30.) Hunt tested a vaginal swab that was found to contain seminal fluid. (*Id.* at 30-31.) She also found sperm cells on a cutting taken from a pair of panties that came from the brown bag. (*Id.* at 31.)

In August 2004, Hunt tested evidence taken from Shakira Carter. (*Id.* at 31.) The vaginal swabs, pubic area swabs and rectal swabs all indicated the presence of seminal fluid. (*Id.* at 32.) She did not detect the presence of seminal fluid from the oral swab. (*Id.*) Hunt did additional testing related to the Carter case in September 2004. Hunt was able to identify a male fraction from the sperm cells and found that it was the same unknown male donor in both cases. (*Id.* at 33-34.) Hunt entered the unknown male fraction into the database and discovered two other cases with the same unknown male donor. (*Id.* at 34-35.) Hunt did not do the final testing in the Carter case to identify the unknown male. (*Id.* at 49.) That testing was done by Joel Schultz. (*Id.* at 50.)

Hunt testified that she did not conduct the follow-up testing in the Fettig case. (*Id.* at 36.) Hunt reviewed the analysis that was conducted by Orchid Cellmark, an outside laboratory. (*Id.* at 36-37.) Hunt reviewed the report for accuracy, made sure there was a proper chain of custody and that the report accurately reflected the result that they obtained. (*Id.* at 37.) Hunt did not detect any inconsistencies with the controls and determined that the report was reliable under Michigan State Police standards. (*Id.* at 38-39.)

Paul Donald of the Michigan State Police crime lab in Grand Rapids testified as an expert in DNA testing, particularly PCR STR testing. (Tr. V, 132.) Donald tested evidence on August 8, 2000, related to the Judith Bryant case and found male DNA on the vaginal swab and pair of panties. (*Id*. at 133-34, 136.) There was not a suspect in the case at the time he conducted the testing in order to do a comparison. (*Id*. at 134.) Donald entered the unknown male file into the DNA database for future reference. (*Id*. at 135-36.) In July of 2005, Donald re-tested the samples in the Bryant case using a kit that analyzed thirteen areas or locations on a persons DNA, as opposed to ten locations under the previous test. (*Id*. at 136-37.) Defense counsel conducted extensive cross-examination regarding the differences between the preliminary report prepared by Donald and his final report. (*Id*. at 139-171.)

Joel Schultz of the Michigan State Police crime lab in Grand Rapids testified as an expert in DNA testing. (Trial Tr. VI, 30-32.) Schultz testified that the DNA testing for the two Wyoming cases (Fetig and Kolk) was outsourced to Orchid Cellmark, while the DNA testing for the Kentwood (Bryant) and Grand Rapids (Carter) cases was conducted in-house at the Grand Rapids lab. (*Id.* at 33-34, 55-56.) The results from the Wyoming cases came back with unknown male profiles, which were entered into the DNA database. (*Id*. at 35.) The match of the unknown male profile in all four cases was discovered in late 2004 or early 2005. (*Id*. at 35-36.) A buccal swab from Petitioner was submitted for testing by Detective Michele Clark in February 2005. (*Id*. at 36-37; Tr. V, 126-28.) Schultz found that Petitioner's DNA profile matched the evidentiary profiles in all four cases. (*Id*. at 39-49.) In each case, the probability of another Caucasian male having the same DNA profile was determined to be 1 in 17.2 quintillion. (*Id*. at 42-49.)

Alisa Gindlesperger, a contract employee of Orchid Cellmark, testified as an expert in DNA analysis.  During the course of her employment with Orchid Cellmark, Gindlesperger conducted DNA analysis and conducted technical review on hundreds of files.  (Trial Tr. VII, 4-5.)  The Maryland lab where the DNA testing for the Fettig and Kolk cases was conducted was closed in 2005 and transferred to the Orchid Cellmark lab in Dallas.  (*Id*. at 12-16.) Gindlesperger obtained the DNA reports for the Fettig and Kolk cases from the Dallas facility and conducted a technical review.  (*Id*.) Gindlesperger testified regarding the DNA testing that was conducted in those cases and concluded that the tests were performed properly and no outside contamination was introduced.  (*Id.* at 34-36.) Nevertheless, Gindlesperger did not perform the DNA testing and the analysts who conducted the testing no longer worked for the company.  (*Id*. at 28, 36-37.)

G.   Petitioner's Testimony

Petitioner was 37-years-old at the time of trial.  (Trial Tr. VII, 41.)  He admitted to having numerous criminal convictions, including receiving and concealing stolen property, larceny and five bank robberies in Florida and Missouri.  (*Id.* at 43.)  With regard to Shakira Carter, Petitioner admitted to picking her up on Division during the summer of 2004.  (*Id*. at 44-45.)  He testified that he parked by the overpass on Hall Street and had sex with Carter in exchange for money.  They also smoked crack together. (*Id*.)  When they were done, Petitioner drove her back to the area where he had picked her up.  (*Id*. at 45.)  Petitioner picked her up again a week or two later and parked in the same area.  According to Petitioner, they smoked six to eight twenty-dollar rocks of crack and had sex.  Petitioner claimed that he initially gave Carter twenty or thirty dollars for sex, but took some of the money out of her pants pocket while they were having sex so that he could buy more crack.  (*Id*. at 46-47.)  Carter did not realized the

money was missing until he was driving her back.  Petitioner told her that he didn't know what happened to the money, but she got angry.  Petitioner stopped his truck and told her to get out.  When Carter got out, she hit or kicked his truck and he drove away. (*Id*. at 47.)  Petitioner maintained that he never assaulted Carter and that the sex was completely consensual during both encounters.  (*Id*. at 47-48, 52.)

Petitioner also admitted to picking up Melissa Smith for sex while he was driving his sister's van. (*Id*. at 49.)  He claims that she agreed to given him oral sex for twenty dollars. (*Id*. at 50.)  When he parked by the Hall Street overpass, Smith allegedly took a crack pipe out of her pants and started getting out some crack to smoke.  Petitioner was mad because she was going to smoke in the van and grabbed the pipe out of her mouth. (*Id*.)  Smith responded by biting him on the leg.  Petitioner pulled her off his leg, kicked her out of the car and drove away. (*Id*. at 50-51.)  Petitioner saw Smith again about three days later when he was driving near the corner of Burton and Division.  She was jumping up and down, and pointing at his van, which made him think, "Wow, that's a crazy hooker." (*Id*. at 51-52.)  Petitioner denied forcing himself upon Smith or assaulting her in any way. (*Id*. at 52.)  Petitioner admitted to living in Grand Rapids at the time the other three women were sexual assaulted, but denied ever having any contact with them. (*Id*. at 53.)  Petitioner believed that the DNA evidence linking him to those cases was wrong. (*Id*. at 54.)  Petitioner was in prison from 1993 until May 2004, when he moved back to Michigan. (*Id*. at 63.)  Petitioner admitted to being a crack addict and to picking up prostitutes "often" while he lived in Grand Rapids. (*Id*. at 58-59.)  He was arrested on bank robbery charges on December 9, 2004. (*Id*. at 60.)

At the conclusion of trial, the jury found Petitioner guilty of CSC I in the Kolk case, two counts of CSC I in the Bryant case, and CSC III in the Carter and Fettig cases. (Trial Tr. VIII(B), 11-12.)

The jury found Petitioner not guilty of assault with intent to commit criminal sexual penetration with regard to Melissa Smith.  (*Id*. at 12.)

At the sentencing hearing held on August, 7, 2007, the trial court sentenced Petitioner in the Kolk case to life imprisonment for the CSC I conviction.  (Sentencing Tr., ECF No. 38, PageID.690.)  In the Bryant case, the court sentenced Petitioner as a third habitual offender to life imprisonment for the first count of CSC I and imprisonment of 40 to 60 for the second count of CSC I. (Sentencing Tr., ECF No. 38, PageID.690-691.)  The Court sentenced Petitioner in the Fettig case as a third habitual offender to imprisonment of 10 to 30 years for the CSC III conviction.  (*Id*. at 691.)  Finally, in the Carter case, the trial court sentenced Petitioner as a fourth-offense habitual offender to imprisonment of 20 to 40 years for the CSC III conviction.  (*Id*.)

## II.   **Direct Appeal**

Petitioner appealed the judgment of conviction and sentence to the Michigan Court of Appeals.  The brief filed by appellate counsel on September 29, 2008, raised four claims of error, including Petitioner's first two grounds for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, ECF No. 40, PageID.728-29.)  Petitioner subsequently filed a pro per supplemental brief rasing the following additional claim:

> THE TRIAL COURT DENIED MR. PAYNE THE RIGHT TO CONFRONT HIS ACCUSER, ORCHID CELLMARK DNA ANALYSIS BY CHRISTINE BAYER AND ALLOWED A CONTRACTED ANALYST [ALISSA GINDLESPERGER] TO GIVE TESTIMONY FROM A COPY OF THE DNA REPORT THAT IS IN QUESTION.  THE CONVICTION SHOULD BE REVERSED.

(*See* Def.-Appellant's Supplemental Pro Per Br. on Appeal, ECF No. 40, PageID.789.)  In an opinion issued on July 28, 2009, the Michigan Court of Appeals found that the laboratory reports in the Kolk and

Fettig cases were not properly admitted under the Michigan rules of evidence and that the error was not harmless because the reports were the only evidence that established an essential element of the CSC charges against Defendant in those cases. *See People v. Payne*, 774 N.W.2d 714, 725-27 (Mich. Ct. App. 2009). The court further concluded that while counsel failed to preserve the Sixth Amendment confrontation claim, the admission of the DNA reports was plain error requiring reversal in those cases. See *Payne*, 774 N.W.2d at 725-28. The appellate court rejected Petitioner's other assignments of error and affirmed the convictions in the other two cases.

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, presenting the same five claims raised in the Michigan Court of Appeals, as well as a new claim that given the acquittal in one case and the court of appeals decision overturning two additional consolidated cases, the jury may have found reasonable doubt as to the other two consolidated cases. (*See* Def.-Appellant's Application for Leave to Appeal, ECF No. 41, PageID.886.) The supreme court denied leave to appeal on May 25, 2010. (*See* Mich. Ord., ECF No. 27.)

III.   **Proceedings in this Court**

Petitioner originally filed a habeas petition in a separate action in September 2010. *See Payne v. Michigan*, No. 1:10-cv-896 (W.D. Mich.). In that action, the court dismissed the petition without prejudice because it contained some claims that had not been exhausted. (12/07/2010 Op.,1:10-cv-896 ECF No. 7.) Petitioner filed the instant petition three months later on March 30, 2011, raising his first two grounds for habeas corpus relief, which had been exhausted on direct appeal.

More than a year later, Petitioner moved to amend the petition to add his third ground for relief (ECF No. 49). Respondent opposed the motion on the ground that the proposed new claim was

-18-

not properly exhausted in the state courts.  In a memorandum opinion and order issued on June 10, 2013

(ECF Nos. 55-56), the Court found that while Petitioner's confrontation claim on direct appeal was not

a model of clarity, the Michigan Court of Appeals explicitly ruled that the confrontation violations in the

Kolk and Fettig cases did not undermine Petitioner's convictions in the Bryant and Carter cases.  Because

the issue was decided by the court of appeals, the Court determined that the exhaustion requirement was

satisfied.  Consequently, the Court granted Petitioner's motion to amend to raise the claim that the

admission of laboratory tests in violation of the Confrontation Clause in two consolidated cases vitiated the

judgment reached by the jury in two other consolidated cases for which Petitioner was found guilty.

### Standard of Review

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions

are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The

AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655

(6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated

pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the

merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved

an unreasonable application of, clearly established federal law as determined by the Supreme Court of the

United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts

in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  This standard is

"intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (quotation

marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 83, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).  The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but

unreasonably applies it to the facts of the particular . . . case." *Williams*, 529 U.S. at 407. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White*, 134 S. Ct. at 1706-07 (quoting *Harrington*, 562 U.S. at 103).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*,

539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the

question).

## Discussion

### I.     Petitioner's Appearance at Trial

In his first ground for relief, Petitioner contends that his rights to the presumption of innocence and a fair trial were violated when, during the first two days of voir dire, he faced the jury with a long, wild beard, wearing leg irons and surrounded by armed deputies.

Before voir dire began on the first day of trial, the trial court stated on the record that the deputies had requested that Petitioner remain shackled at the ankles during the proceedings. The Court explained:

> I would note one other thing for the record. The deputies here – and they don't make this request very often – wanted the defendant to be chained at his feet here. And I've considered that; and there are a number of factors that go into these decisions. And I've been doing this now for 18 years; and, frankly, it's rare to get this type of request. It does come up from time to time, but I don't generally grant it unless there's a good reason for it. And I can probably count on one hand the number of times that we've done this.
>
> But in fairness to the defendant here, what we've done - - and we've involved the defense attorney - - in the positioning of tables and so forth, I've had the tables for both the prosecutor and the defense skirted; in other words, I have paper hanging around three sides of both tables so that they look the same and so that the jurors will not be in a position to look underneath the table and see leg irons on the defendant. He's dressed in civilian clothes today. I don't see, given that situation, given the fact we won't have him brought in and out of the courtroom while the jurors are here, that I think that addresses any potential concerns.

(Tr. I, 12-13.) When asked if he had anything further to say on the matter, defense counsel noted that the tables were "adequately skirted" and that Petitioner's shackles were concealed from the potential jurors. (Tr. I, 13.)

On the second day of jury selection, Petitioner objected to the table skirting and requested to shave. (Tr. II, 3.) The following exchange took place between Petitioner and the trial court:

DEFENDANT: [The paper skirting] makes me look guilty, I think.  It looks suspicious why there's paper sacks all over.

COURT: Well, I'm happy to take it off.  The only issue is I don't control security. I control things here in the courtroom, I don't know anything about you.  You've been certainly fine in court the short time I've been with you here.  But I've been doing this a long time and I generally don't try to dictate how security decisions are made, and for whatever reason the security detail felt you should be in leg irons during the trial.

That happens from time to time, and usually there are reasons for it. You may not agree with them, but, you know, if something were to -- they don't do that and something happens, they look bad.

DEFENDANT:  I'm definitely not going to disrupt the courtroom.

COURT: So with that in mind, I just figured, well, we'll do something and I would try to make both tables look the same.  So it doesn't, you know, make you look any different than the prosecutor and -- but if you want to at some -- you know, we had it set up this way yesterday, so everybody here yesterday saw it.

As you know, I have a medical appointment this morning at 11:00, so I'd like to have the jury picked by then.  We can take it off, but it doesn't address the concern of the leg irons. I don't know if they can see them or not.  Are they visible without --

DEFENDANT: Yeah, I've got shower shoes on and leg irons.  I mean, I look like I'm convicted already.

COURT:  Well, except they can't see 'em.  That's the whole reason we've done this here. I don't know why paper around the table would --

DEFENDANT:  I would like to be able to shave, too.

COURT:  I understand that was another issue, and that's something I wasn't aware of until a short time ago.

*** 

DEFENDANT:  This looks like I'm trying to hide behind a beard.

COURT:  I understand that.  So I'll see what I can do today, see if we can address that issue somehow with the Sheriff's Department.

DEFENDANT: With the terrorist situation, beards are not popular right now. I look like an imam from the Taliban or something.

(Tr. II, 3-4.) Petitioner had not been permitted to possess a razor due to security concerns at the jail. (Tr. II, 4.)[2] The trial court went on to assure Petitioner that it would take steps to get him shaved. (Tr. II, 4-8.)

On the third day of voir dire, the record shows that Petitioner had shaved and the court decided to remove Petitioner's shackles, as well as the table skirting. (Tr. III(A), 3-6.) The trial court was concerned about the jury noticing that the courtroom's appearance had changed, and after discussing the matter with the defense, offered the following explanation to the jury:

It's kind of nice to have the courtroom back in the usual condition. We do have things that go on here sometimes in the evening hours. Examples of that, my son is involved with some high school programs, and occasionally people are in here. So we're back to normal, it's the more typical, traditional way the courtroom usually looks.

(Tr. III(A), 8.) The trial court later asked defense counsel outside the presence of the jury if he had any objection to the way the court's commented on the courtroom setup. Counsel had no objection and thanked the court. (Tr. III(A), 55). After the jury was selected, the trial court gave preliminary instructions and the trial began with the prosecutor's opening statement. (Tr. III(A), 55-72).

The Michigan Court of Appeals found that Petitioner was not prejudiced by wearing leg shackles for the first two days of trial. The court further held that the trial court did not abuse its discretion with regard to Petitioner's personal appearance, stating:

Defendant first argues that he was denied his right to a fair trial when he was forced to appear in court with an unshaven face, wearing leg shackles, and surrounded by armed guards in the courtroom during the first two days of trial. We review a trial court's decision to shackle a defendant for an abuse of discretion under the totality of the

---

[2] Petitioner later claimed that he had not been allowed to shave for seven months. (Tr. III(A), 4.)

circumstances. *People v Dixon*, 217 Mich App 400, 404-405; 552 NW2d 663 (1996). With respect to a defendant's physical appearance during trial, we also review the trial court's decision for an abuse of discretion. *See People v Harris*, 201 Mich App 147, 151; 505 NW2d 889 (1993). We defer to the trial court's superior opportunity to observe the defendant and to determine whether the defendant's appearance prejudicially marks him or her as a prisoner. *Id*. at 152.

A

Included within the right to a fair trial, absent extraordinary circumstances, is the right to be free of shackles or handcuffs in the courtroom. *Dixon*, 217 Mich App at 404. While this right is not absolute, a defendant "may be shackled only on a finding supported by record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order." *People v Dunn*, 446 Mich 409, 425; 521 NW2d 255 (1994). But even if a trial court abuses its discretion and requires a defendant to wear restraints, the defendant must show that he suffered prejudice as a result of the restraints to be entitled to relief. *People v Horn*, 279 Mich App 31, 36; 755 NW2d 212 (2008). "[A] defendant is not prejudiced if the jury was unable to see the shackles on the defendant." *Id*. We conclude that the trial court abused its discretion by requiring defendant to wear leg shackles in the courtroom because the court's decision in this regard was not supported by the record evidence. There was quite simply no evidence to suggest that defendant was a flight risk, that he was likely to attempt to escape, or that shackles were needed to maintain order in the courtroom. However, defendant has failed to show that he suffered prejudice. Indeed, the record shows that the defense table in the courtroom was skirted with paper, which prevented the jury from seeing the shackles. Moreover, defendant entered and left the courtroom while the jury was not present. We perceive no actual prejudice to defendant on the facts of this case.

B

We conclude that the trial court did not abuse its discretion with respect to defendant's personal appearance. It is true that a criminal defendant generally has the right to appear before the court "'with the appearance, dignity, and self-respect of a free and innocent man . . . .'" *People v Shaw*, 381 Mich 467, 474; 164 NW2d 7 (1969) (citation omitted). Defendant contends that he was required to appear before the jury with eight months of beard growth because jail personnel had not allowed him to shave. We cannot conclude that defendant's beard, alone, constituted an impermissibly distinctive reminder of defendant's incarcerated status or prejudicially marked him as a prisoner. *See Harris*, 201 Mich App at 152. Moreover, defendant did not object to his appearance in court until the second day of trial, at which time the trial court took immediate measures to provide him with access to grooming supplies before his next appearance in court. Under

-26-

these circumstances, we find no abuse of discretion.  Defendant was not denied his right to a fair trial.

C

Defendant also refers in his statement of the questions presented to his appearance in court "surrounded by armed guards."  Defendant has abandoned this issue by failing to provide any analysis in the text of his brief on appeal.  MCR 7.212(C)(7); *People v Anderson*, 209 Mich App 527, 538; 531 NW2d 780 (1995).  Even more importantly, we note that the record is devoid of any evidence that defendant was "surrounded" by armed guards at any time during trial.  We perceive no error in this regard.

*Payne*, 774 N.W.2d at 720-21.

A.    <u>Leg Irons</u>

In *Deck v. Missouri*, 544 U.S. 622 (2005), Carman Deck was convicted of capital murder.  A sentencing phase followed, during which he was shackled, in plain view of the jury, with leg irons, handcuffs, and a belly chain.  Deck was sentenced to death and the Missouri Supreme Court affirmed. 544 U.S. at 624-25.  The United States Supreme Court vacated the sentence, holding that "the Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, *unless* that use is justified by an essential state interest - such as the interest in courtroom security - specific to the defendant on trial."  *Id*. at 624 (emphasis in original; quotation marks deleted).  Due to the nature and inherent prejudice of shackling, *see Deck*, 125 S.Ct. at 2015 (quoting *Holbrook*, 475 U.S. at 568), a "defendant need not demonstrate actual prejudice to make out a due process violation.  The State must prove beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained."  *Id*. at 2015 (citation and alteration omitted).  Thus, if the State can prove that the shackling was harmless error, the Court must deny the petition.  *See Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005).

-27-

In *Mendoza v. Berguis*, 544 F.3d 650 (2008), the Sixth Circuit applied the Supreme Court's holding in *Deck* to a case involving facts similar to this one. In that case, the county sheriff deemed Mendoza "a flight and security risk based on 'a series of incidents' that had occurred during Mendoza's incarceration." *Id.* at 651. Consequently, the sheriff recommended that Mendoza wear leg shackles during the trial. The court concealed Mendoza's shackles from the jury by skirting both counsel tables with brown paper for the duration of the trial. *Id.* The Sixth Circuit held that Mendoza's leg shackles did not violate *Deck* because the Court's holding was limited to *visible* restraints. *Id.* at 654. Indeed, throughout its opinion, the Supreme Court repeatedly limited its holding to visible restraints. *See Deck*, 544 U.S. at 630 ("*[v]isible* shackling undermines the presumption of innocence") (emphasis added); *id.* at 632 ("[d]ue process does not permit the use of *visible* restraints if the trial court has not taken account of the circumstances of the particular case") (emphasis added); *id.* at 633 ("courts cannot routinely place defendants in shackles or other physical restraints *visible to the jury* during the penalty phase of a capital proceeding"); *id.* at 635 ("[w]here a court, without adequate justification, orders the defendant to wear shackles *that will be seen by the jury*, the defendant need not demonstrate actual prejudice to make out a due process violation") (emphasis added).

The trial court in this case had both counsel tables skirted with brown paper to conceal Petitioner's leg irons. Because Petitioner's leg irons were not visible to the jury, the decision of the Michigan Court of Appeals was not an unreasonable application of *Deck*. *See Mendoza*, 544 F.3d at 654; *see also Earhart v. Konteh*, 589 F.3d 337, 348 (6th Cir. 2009) (If [a petitioner]'s stun belt was a visible restraint, due process mandates an individualized finding of necessity before the state courts could require [a petitioner] to wear the belt. If the stun belt was not visible, then there is not a violation of clearly

established federal law sufficient to grant the writ.") Moreover, Petitioner only wore the leg irons for the first two days of voir dire, during which time he entered and exited the courtroom outside the presence of the jury.  After Petitioner objected to wearing the leg irons, the trial court had them removed for the remainder of the trial.  As set forth above, the trial court also offered an explanation to the jury for the removal of the brown paper from the counsel tables that was unrelated to the trial in order to mitigate the risk of prejudice to Petitioner.

Even if this Court found that allowing Petitioner to be present in the courtroom wearing leg irons without clearly articulating an essential state interest constituted constitutional error, the Michigan Court of Appeals correctly concluded that the error was harmless.  On habeas review, harmless error is assessed under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  Under *Brecht*, 507 U.S. at 638, the Court must consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result.  In light of the overwhelming evidence of Petitioner's guilt, any constitutional error in shackling petitioner during the initial day of trial did not have a substantial and injurious effect on the jury's verdict.  The DNA evidence presented at trial was particularly damaging to Petitioner's case.  DNA evidence collected from Bryant and Carter linked Petitioner to the assaults.  (Trial Tr. VI, 39-49.)  In both cases, the probability of another Caucasian male having the same DNA profile was determined to be 1 in 17.2 quintillion.  (*Id*. at 42-49.)  Consequently, any error resulting from the use of shackles was harmless.  *See Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005) ("Despite the substantial risk of prejudice that shackles pose, we are compelled to conclude that the error was harmless in this case due to the overwhelming evidence against Lakin."); *see also United States v. Lane*, 474 U.S. 438, 450

(1986) ("In the face of overwhelming evidence of guilt shown here, we are satisfied that the claimed error was harmless.").

>B.   Beard

Petitioner also claims that his right to the presumption of innocence and a fair trial were violated when he was forced to appear before the jury with a long beard.  The Supreme Court has held that compelling a defendant to stand trial in identifiable prison clothes is inconsistent with the presumption of innocence accorded criminal defendants and the concept of equal justice embodied in the Fourteenth Amendment.  *See Estelle v. Williams*, 425 U.S. 501 (1976). Petitioner has pointed to no Supreme Court case that prohibits an accused from appearing at trial with a long beard.  Moreover, as discussed by the Michigan Court of Appeals, the trial court took immediate action to provide Petitioner with shaving equipment after he complained about his appearance.  Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of clearly established Supreme Court precedent.

>C.   Surrounded by Armed Guards

The Michigan Court of Appeals deemed Petitioner's claim that he was "surrounded by armed guards" abandoned for lack of legal argument.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal

-30-

constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice.  *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.  The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.  *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

In this instance, the Michigan Court of Appeals relied upon a state procedural rule to default Petitioner's claim.  Petitioner has failed to demonstrate cause and prejudice for his default or that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. Consequently, Petitioner's claim is barred from review by this Court.

## II.   **Ineffective Assistance of Counsel**

In his second ground for habeas relief, Petitioner asserts numerous claims of ineffective assistance of counsel.  In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell

-31-

below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

-32-

A.   <u>Refused to meet with Petitioner before trial; failed to secure Petitioner's</u>
<u>presence at a single pre-trial hearing</u>

Petitioner contends that counsel was ineffective for failing to meet or confer with him during

the seven-month period between the preliminary examination and trial.  As a result, Petitioner claims that

he was unaware of the defense strategy and was denied the opportunity for meaningful pre-trial plea

negotiations.  Petitioner was presented with a plea offer on the first day of trial for one count of CSC I with

a 20-year cap on the minimum sentence, which he rejected.  Petitioner argues that had counsel met with

him and brought him to court to negotiate a plea, he may have accepted it.

The Michigan Court of Appeals rejected Petitioner's claims, stating:

> Defendant first contends that defense counsel's failure to meet with him during the
> time between the preliminary examination and the first day of trial amounted to ineffective
> assistance of counsel.  However, the record reveals that defense counsel was prepared for
> trial, displayed an adequate knowledge of the evidence, and was fully prepared to
> cross-examine the prosecution's witnesses.  We cannot conclude that counsel's
> performance in this regard fell below an objective standard of reasonableness.  *Toma*, 462
> Mich at 302.  Similarly, defendant asserts that defense counsel's failure to secure his
> attendance at a "single pretrial hearing" amounted to ineffective assistance of counsel.  But
> the record indicates that defendant waived formal arraignment and that there were no
> pretrial hearings that took place between the preliminary examination and the first day of
> trial.  Thus, we cannot conclude that defense counsel was ineffective in this regard.

*Payne*, 774 N.W.2d at 721.

While Petitioner complains about counsel's failure to meet with him between the preliminary

examination and trial, his claims of prejudice are highly speculative.  "[T]he mere fact that counsel spent little

time with [Petitioner] is not enough under *Strickland*, without evidence of prejudice or other defects."

*Bowling v. Parker*, 344 F.3d 487, 506 (6th Cir. 2003) (Trial attorneys' alleged failure to consult with

defendant did not prejudice defendant in capital murder case, and thus could not amount to ineffective

assistance, although attorneys allegedly met with defendant for less than one hour in preparing defense, where defendant failed to show how additional consultation with his attorneys could have altered outcome of trial). The only specific allegations of prejudice concern Petitioner's opportunity to negotiate a plea agreement. However, Petitioner concedes that he was presented with the plea offer and chose to reject it. He cannot show how he was prejudiced by not getting the plea offer earlier. Likewise, Petitioner does not allege how he was prejudiced by counsel's failure to secure his attendance at any pre-trial hearings, particularly when none was held. Consequently, the decision of the court of appeals was not an unreasonable application of *Strickland*.

> B.    Failed to obtain independent testing of the available DNA evidence; failed to make an opening statement; elicited improper testimony on cross-examination of two prosecutorial witnesses

Petitioner further asserts that counsel was ineffective for failing to obtain independent DNA testing, failing to make an opening statement and eliciting improper identification testimony from two of the victims. The Michigan Court of Appeals disagreed, stating:

> Defendant next contends that several strategic decisions made by his trial attorney constituted ineffective assistance of counsel. Specifically, defendant asserts that defense counsel should have retained independent expert witnesses to review the work of the prosecution's DNA experts, that defense counsel improperly cross-examined two of the victims, and that defense counsel should not have waived his opening statement. An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy. *People v Ackerman*, 257 Mich App 434, 455; 669 NW2d 818 (2003). A defendant must meet a heavy burden to overcome the presumption that counsel employed effective trial strategy. *Id*. In general, the failure to call a witness can constitute ineffective assistance of counsel only when it "deprives the defendant of a substantial defense." *People v Hoyt*, 185 Mich App 531, 537-538; 462 NW2d 793 (1990). Similarly, the waiver of an opening statement involves "a subjective judgment on the part of trial counsel which can rarely, if ever, be the basis for a successful claim of ineffective assistance of counsel." *People v Pawelczak*, 125 Mich App 231, 242; 336 NW2d 453 (1983). "We will not substitute our judgment for that of counsel on matters of trial

strategy, nor will we use the benefit of hindsight when assessing counsel's competence." *People v Unger*, 278 Mich App 210, 242-243; 749 NW2d 272 (2008).

In addition, we note that irrespective of whether defense counsel's decision concerning whether to retain independent experts was proper trial strategy, defendant has merely speculated that an independent expert could have provided favorable testimony. In other words, defendant has failed to show that the retention of an independent expert would have altered the outcome of the lower court proceedings. *Carbin*, 463 Mich at 600. Similarly, with respect to defense counsel's cross-examination of the two victims, as well as counsel's decision to forgo an opening statement, defendant has failed to establish that his attorney performed deficiently under an objective standard of reasonableness or that counsel's specific actions affected the outcome of the lower court proceedings. *Id*.

*Payne*, 774 N.W.2d at 722.

### 1.    Failed to retain DNA expert

Following *Strickland*, the lower courts generally hold that counsel's decision not to call an expert to rebut the prosecution's expert is sound trial strategy. *See, e.g., Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) ("decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney"); *Bower v. Quarterman*, 497 F.3d 459, 467 (5th Cir. 2007) ("An early formulation of trial strategy and a decision to attack the state's expert witnesses on cross examination rather than calling additional experts can be a part of a reasonable trial strategy"). In *Harrington v. Richter*, 131 S.Ct. 770, 791 (2011), the Supreme Court approved of the foregoing approach of evaluating counsel's decision to focus on cross-examination rather than call a rebuttal witness within the framework of overall trial strategy:

. . . *Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.

In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict. Here Richter's attorney represented him with vigor and conducted a skillful cross-examination. As noted, defense counsel elicited concessions from the State's experts and was able to

draw attention to weaknesses in their conclusions stemming from the fact that their analyses were conducted long after investigators had left the crime scene. For all of these reasons, it would have been reasonable to find that Richter had not shown his attorney was deficient under *Strickland*.

In this case, defense counsel conducted extensive and vigorous cross-examination of the prosecutor's DNA experts and challenged the validity of the DNA evidence in his closing argument. (Trial Tr. III(B), 32-35; Tr. IV, 10-11, 43-46; Tr. V 41-49, 53-57, 67-71, 139-170; Tr. VI, 25-29, 50-61; Tr. VII, 12-21, 25-26, 36-37; Tr. VIII, 47.) Rather than hiring a defense expert, counsel made a legitimate strategic decision to focus on flaws on the collection, storage and testing of the DNA evidence. In addition, Petitioner has failed to establish that any deficient performance was prejudicial. While Petitioner baldly asserts that the DNA evidence was wrong, his assertion that a defense expert would have made different findings is purely speculative. Moreover, had a defense expert made the same findings as the state experts, it would have been devastating to Petitioner's case. Petitioner, therefore, cannot overcome the presumption that counsel's decision was reasonable trial strategy.

### 2.    Failed to make opening statement

A trial counsel's failure to make an opening statement, standing alone, does not establish the ineffective assistance of counsel. *Moss v. Hofbauer*, 286 F.3d 851, 863 (6th Cir. 2002). The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel. *Id*.; *Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004) ("An attorney's decision not to make an opening statement is ordinarily a mere matter of trial tactics and . . . will not constitute . . . a claim of ineffective assistance of counsel."); *see also United States v. Rodriguez-Ramirez*, 777 F.2d 454, 458

(9th Cir. 1985) ("The timing of an opening statement, and even the decision whether to make one at all, is ordinarily a mere matter of trial tactics and in such cases will not constitute the incompetence basis for a claim of ineffective assistance of counsel."); *United States v. Salovitz*, 701 F.2d 17, 20-21 (2d Cir. 1983) (noting that trial counsel's decision to waive an opening statement is often a matter of trial strategy and ordinarily will not form the basis for a claim of ineffective assistance of counsel); *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965) (noting that trial counsel's decision not to make an opening statement "was a matter of professional judgment, and . . . was very likely the wiser course to follow" because of the strong case against the defendant).

Petitioner claims that he was prejudiced by counsel's failure to make an opening statement because the jury did not hear the defense theory until closing arguments. Such generalized speculation provides no credible evidentiary basis for finding either prong of the *Strickland* analysis satisfied. The state courts applied *Strickland* reasonably, and Petitioner shows no error under the applicable standards.

### 3.     Elicited improper testimony on cross-examination

Next, Petitioner claims that counsel was ineffective when, on cross-examination, he elicited testimony from complainants Bryant and Carter identifying Petitioner as their attacker. With regard to Bryant, defense counsel clearly was attempting to elicit her testimony from the preliminary examination that she could not identify Petitioner due to the passage of time. Counsel's strategy is evident from the following line of questioning:

> Q:    And then Ms. Brinkman asked you if you had ever seen the individual who
>        assaulted you after the incident –

A:      No

Q:      – and you indicated that you saw him again at the preliminary.

A:      Right.

Q:      What are you referring to?

A:      Pardon?

Q:      What do you mean, you saw him again at the preliminary?

A:      At the hearing, that's the only time I saw him after.

Q:      Are you saying that you identified that that [sic] person at the preliminary examination was the person who assaulted you?

A:      No, I'm saying – you asked me if I ever saw him after the assault, and I'm say I did not, except at the preliminary in Kentwood. That's when I first ever saw him again.

Q:      Okay. So are you saying – let me get to the point here, ma'am. Are you saying that that [sic] man here is the person who assaulted you [indicating]?

A:      Yes. I am.

Q:      You recognize that man (indicating) as the person who assaulted you?

A:      As far as my composite from back then, no, because he had much longer hair. He looks much different 19 years ago.

Q:      How do you know that this person is the person who assaulted you?

A:      Because my DNA matched 100 percent.

Q:      Okay. Well, let's – I'm just asking what you recollection is. Can you identify this person as the one, from what you saw, from what you recall, that this is the man who assaulted you?

A:      Yes.  If I put the hair on and took the glasses off, absolutely, yes.

-38-

Q:      Why didn't you say that at the preliminary examination?  Because I asked you the
        same question and you said you could not identify that person as the person who
        assaulted you.

A:      I don't remember you asking me that at the preliminary examination.

                                        ***

Q:      And you don't recall testifying otherwise at the preliminary examination?

A:      I think I basically told you the same thing then, that if I put the hair and the glasses,
        and took 19 years off the age, that, yes, that very well could be the person.  I think
        I told you the same thing then.

Q:      Thank you, ma'am.

A:      That's what I remember telling you, anyway.

(Trial Tr. IV, 32-35.)  Counsel cannot be deemed ineffective when the witness changed her testimony from

the preliminary examination.  Although counsel did not directly impeach the witness with her preliminary

examination testimony, the jury could reasonably infer from counsel's questions and Bryant's responses,

that her testimony at trial was not entirely consistent with her testimony at the preliminary examination.  In

fact, counsel's questions brought out the fact that Bryant was relying on the DNA evidence to be certain

about her identification.  Otherwise she could only say that Petitioner "very well could be the person" who

attached her.  With regard to Carter, Petitioner cannot show prejudice resulting from her identification

testimony as Petitioner admitted during his own testimony that he picked her up on two occasions and had

sex with her.  (Tr. VI, 44-48, 52.)  Accordingly, the court of appeals did not unreasonably apply

*Strickland* in finding that counsel's performance was constitutionally sufficient.

        C.      <u>Failed to prevent Petitioner from appearing before the jury with a long,
        wild beard and leg irons</u>

Finally, Petitioner asserts that counsel was ineffective for allowing him to appear in court with a long beard and leg irons.  The Michigan Court of Appeals found that Petitioner could not establish prejudice resulting from counsel's alleged deficient performance, stating:

> Defendant contends that defense counsel was ineffective for failing to object to defendant's appearance in court with a "wild beard" and leg shackles.  As we have already stated, defendant cannot show that the shackles prejudiced him because the jury never saw them.  *Horn*, 279 Mich App at 36.  Nor has defendant shown that he was in any way prejudiced by his appearance at trial, including the presence of facial hair.  Trial counsel is not ineffective for failing to advocate a meritless position. *People v Goodin*, 257 Mich App 425, 433; 668 NW2d 392 (2003).  And even assuming that counsel did err by failing to object in this regard, defendant cannot demonstrate that, but for counsel's alleged errors, the outcome of trial would have been different.  *People v Mitchell*, 454 Mich 145, 167; 560 NW2d 600 (1997).
>
> [5] *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973).

*Payne*, 774 N.W.2d at 722.

The decision of the Michigan Court of Appeals was a reasonable application of *Strickland*. Petitioner cannot show that he was prejudiced by the leg irons as he only wore them for the first two days of voir dire and they were concealed from the jury by paper skirting around the table.  Likewise, Petitioner cannot establish prejudice resulting from wearing a long beard for the first two days of trial.  Moreover, as previously discussed, the DNA evidence provided overwhelming evidence of Petitioner's guilt.

### III.   **Confrontation**

In his third ground for habeas corpus relief, Petitioner asserts that the introduction of hearsay testimony in violation of the Confrontation Clause in two of the consolidated cases constituted "structural error" that vitiated the judgment in the other two cases.

-40-

On direct appeal, the Michigan Court of Appeals held that the admission of the hearsay laboratory reports in Kent Circuit Court Case Nos. 06-011607-FC (Kolk) and 06-011944-FC (Fettig) violated Petitioner's Sixth Amendment right to confrontation, stating:

> The Confrontation Clause of the Sixth Amendment bars the admission of testimonial hearsay unless the declarant is unavailable and the defendant has had a prior opportunity for cross-examination. *Crawford v Washington*, 541 US 36, 68; 124 S Ct 1354; 158 L Ed 2d 177 (2004); *People v Walker*, 273 Mich App 56, 60-61; 728 NW2d 902 (2006).
>
> In *People v Lonsby*, 268 Mich App 375, 392-393; 707 NW2d 610 (2005), now-Chief Judge Saad concluded that a laboratory report prepared by a nontestifying analyst was testimonial hearsay within the meaning of *Crawford*. In *Lonsby*, the in-court testimony of one analyst was offered for the purpose of introducing the laboratory report, findings, and conclusions of a different, nontestifying analyst. Judge Saad concluded that the inculpatory laboratory report, prepared by the nontestifying analyst, constituted testimonial hearsay within the meaning of Crawford. *Lonsby*, 268 Mich App at 392-393. Specifically, Judge Saad wrote that because there was "no showing that [the nontestifying analyst] was unavailable to testify and that defendant had a prior opportunity to cross-examine her, the admission of the evidence violated defendant's Confrontation Clause rights, as defined by the United States Supreme Court in *Crawford*." *Lonsby*, 268 Mich App at 393.
>
> We acknowledge that because the other members of the *Lonsby* panel concurred in the result only, *Lonsby* is not binding precedent. *See Fogarty v Dep't of Transportation*, 200 Mich App 572, 574-575; 504 NW2d 710 (1993). However, Judge Saad's well-reasoned opinion in Lonsby is fully consistent with the United States Supreme Court's recent decision in *Melendez-Diaz v Massachusetts*, 557 US ___; 129 S Ct 2527; 174 L Ed 2d 314 (2009). In *Melendez-Diaz*, the United States Supreme Court concluded that certain affidavits — which certified the out-of-court findings of nontestifying laboratory analysts — constituted testimonial hearsay because they had been prepared for the purpose of establishing an element of the criminal charges against the defendant. The *Melendez-Diaz* Court concluded that the hearsay affidavits were consequently inadmissible against the defendant "[a]bsent a showing that the analysts were unavailable to testify at trial and that [the defendant] had a prior opportunity to cross-examine them . . . ." *Id.* at ___; 129 S Ct at 2532 (emphasis in original). Because Judge Saad's opinion in *Lonsby* fully comports with the recent decision in *Melendez-Diaz*, we adopt the reasoning of *Lonsby* as our own.

Similar to the facts of *Lonsby* and *Melendez-Diaz*, in the instant case, DNA testing was conducted and it resulted in the generation of laboratory reports that were used against defendant at trial. Just as the nontestifying laboratory analysts in *Melendez-Diaz* knew that their affidavits would later be used in criminal proceedings to establish that the defendant in that case had possessed cocaine, it is clear to us that the nontestifying analyst who generated the reports in the present case must have known that the purpose was to ultimately establish the perpetrator's identity through DNA evidence. Although the witnesses who actually testified concerning the laboratory reports at issue here had basic knowledge concerning DNA testing and the methods used to prepare the reports in general, they had not personally conducted the testing, had not personally examined the evidence collected from the victims, and had not personally reached any of the scientific conclusions contained in the reports. In short, the laboratory reports admitted in Kent Circuit Court Case Nos. 06-011607-FC and 06-011944-FC constituted testimonial hearsay, *Lonsby*, 268 Mich App at 392-393, and "[a]bsent a showing that the analyst[ was] unavailable to testify at trial and that [defendant] had a prior opportunity to cross-examine [the analyst]," defendant "was entitled to '"be confronted with"' the analyst[] at trial," *Melendez Diaz*, 557 US at ___; 129 S Ct at 2532, quoting *Crawford*, 541 US at 54. No such showing was ever made. Accordingly, the trial court plainly erred by admitting the laboratory reports of the nontestifying analyst in Kent Circuit Court Case Nos. 06-011607-FC and 06-011944-FC.

Of course, although defense counsel did object to the admission of the laboratory reports on the ground that they were inadmissible under the rules of evidence, counsel did not object to the admission of the reports on Confrontation Clause grounds. Therefore, defendant's Confrontation Clause argument was not preserved, *People v Bauder*, 269 Mich App 174, 177-178; 712 NW2d 506 (2005), and we must therefore determine whether the plain constitutional error affected defendant's substantial rights, *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). In order to avoid forfeiture under the plain-error rule, it must be shown that the plain error affected the outcome of lower court proceedings. *Id*. at 763. And even then, we will generally reverse only if the defendant is actually innocent or the error has seriously affected the fairness, integrity, or public reputation of the judicial proceedings independent of the defendant's innocence. *Id*. at 763-764.

After reviewing the record, we are compelled to conclude that the improperly admitted laboratory reports were decisive to the outcome of defendant's trial. Taken together, the DNA laboratory reports far and away constituted the single most condemning piece of evidence introduced against defendant in Kent Circuit Court Case Nos. 06-011607-FC and 06-011944-FC. Unlike Kent Circuit Court Case No. 06-012819-FH, in which defendant admitted that he had solicited the victim for sex, defendant never admitted to any contact whatsoever with the victims in Kent Circuit Court Case Nos. 06-011607-FC and 06-011944-FC. No other physical evidence linked

-42-

defendant to the crimes. Indeed, only the DNA evidence contained in the hearsay laboratory reports tied defendant to the victims in Kent Circuit Court Case Nos. 06-011607-FC and 06-011944-FC. Albeit in a different context, this Court has recognized the "significant possibility" that a jury might attribute preemptive or undue weight to improperly admitted DNA evidence. *People v Coy*, 243 Mich App 283, 302-303; 620 NW2d 888 (2000). We simply cannot say that the jury would have convicted defendant in Kent Circuit Court Case Nos. 06-011607-FC and 06-011944-FC if the improper hearsay reports had been excluded from consideration. Defendant has sufficiently demonstrated that the plainly erroneous admission of the testimonial hearsay reports affected the outcome of the lower court proceedings. *Carines*, 460 Mich at 763-764.

We also believe that the erroneous admission of the testimonial hearsay evidence affected the fairness and integrity of defendant's trial. *Id*. at 764. There simply was no other independent and properly admitted evidence of defendant's guilt sufficient to erase or overcome the overwhelming taint of the improperly admitted hearsay reports. *See Coy*, 243 Mich App at 313. Although the *Carines* plain-error rule sets a high bar for appellate review in cases of unpreserved error, we conclude that the plainly erroneous admission of the testimonial DNA reports in Kent Circuit Court Case Nos. 06-011607-FC and 06-011944-FC affected the fairness and integrity of the judicial proceedings. *Carines*, 460 Mich at 764.[7]

> [7] In contrast to Kent Circuit Court Case Nos. 06-011607-FC and 06-011944-FC, the laboratory analysts who conducted the DNA testing and prepared the laboratory reports in Kent Circuit Court Case Nos. 06-011875-FC and 06-012819-FH *did* testify at trial. **We perceive no evidentiary or Confrontation Clause error with respect to the admission of the laboratory reports in Kent Circuit Court Case Nos. 06-011875-FC and 06-012819-FH**.

*Payne*, 774 N.W.2d at 725-27 (emphasis added).

Petitioner contends that reversal of his convictions in the Kolk and Fettig cases was insufficient. The other two judgments in the Bryant and Carter cases also should have been reversed, even though the DNA technician who performed the analysis in those cases actually testified and was cross-examined. The Sixth Circuit has held that admission of evidence in violation of the Confrontation Clause is not a structural error. *United States v. Graham*, 278 F. App'x 538, 545 n.2 (6th Cir. 2008). Thus, harmless error review will apply in this case. Under the prevailing harmless error standard, the court must determine whether the Confrontation Clause violations in the Kolk and Fettig cases had a "substantial and

injurious effect or influence" in determining the jury's verdict in the Bryant and Carter cases. *See Brecht*, 507 U.S. at 637-38. The Michigan Court of Appeals answered this question, finding that these errors did not have an outcome-determinative effect on the other two cases. 774 N.W.2d at 727 n.7. That decision will be accorded deference as required by AEDPA. *See Miller v. Colson*, 694 F.3d 691, 699-700 (6th Cir. 2012) (state appellate court finding of harmless error entitled to AEDPA deference). Consequently, this Court "may not grant [Petitioner]'s habeas petition . . . if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003).

In this case, the state court's harmless error determination was entirely reasonable. First, there was no constitutional error in the Bryant and Carter cases because the laboratory reports were prepared by analysts who testified at trial. Second, there was other corroborating evidence in the Bryant and Carter cases that undermine a finding that the improperly admitted evidence in the other two cases was decisive to the outcome in the Bryant and Carter cases. Petitioner admitted to soliciting Carter for sex. (Tr. VI, 44-48.) In addition, both Carter and Bryant identified Petitioner as their attacker. (Tr. III(B), 60-61; Tr. IV, 33-35; Tr. V, 100.) Because the error was harmless, Petitioner is not entitled to habeas corpus relief.

Moreover, Petitioner is not entitled to relief under a theory of cumulative error. Under the AEDPA, a court only may grant habeas relief based on a misapplication of Supreme Court law. *Bailey*, 271 F.3d at 655. The Sixth Circuit repeatedly has stated that cumulative error claims are not cognizable on habeas review. "The Supreme Court has not held that constitutional claims that would not individually

-44-

support habeas relief may be cumulated in order to support relief." *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Keith v. Mitchell*, 455 F.3d 662, 679 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006); *Baze v. Parker*, 371 F.3d 310, 330 (6th Cir. 2004); *Millender v. Adams,* 376 F.3d 520, 529 (6th Cir. 2004); *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir. 2002).  Finally, because I concluded above that the individual claims are without merit, Petitioner cannot show that the cumulative error violated his constitutional rights.  *See Seymour*, 224 F.3d at 557.

**Conclusion**

In light of the foregoing, the Court will deny the petition for failure to raise a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).     The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues

-45-

presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.


dated:  March 1, 2017               /s/ Paul L. Maloney
                                    Paul L. Maloney
                                    United States District Judge